[No. A131535. First Dist., Div. Five. Feb. 27, 2012.]

In re A.R. et al., Persons Coming Under the Juvenile Court Law.
CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES
BUREAU, Plaintiff and Respondent, v.
JAMES R., Defendant and Appellant;
A.R. et al., Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II.A. and B.

## COUNSEL

Marin Williamson, under appointment by the Court of Appeal, for Appellants.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Sharon L. Anderson, County Counsel, and Marke Estis, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**SIMONS, J.**—A.M., born in June 1993, and A.R., born in January 2005, are the children of Jamie W. (Mother). Both were the subject of dependency petitions. James R. is A.R.'s father and lived with Mother at the commencement of these proceedings.[1] Following the jurisdictional hearing, the court found "not true" all the counts relating to A.R. and the sexual abuse allegations relating to A.M. A.R.'s petition was dismissed. The Minors appeal these rulings, which we affirm in the unpublished portion of this opinion. James appeals A.M.'s dispositional order providing her with supervised visitation rights with James's son, A.R. In the published portion of this opinion, we reverse that order.

---

[1] Mother is not a party to the instant appeals. Mother and James are collectively referred to as "Parents." A.M. and A.R. are collectively referred to as "the Minors."

## BACKGROUND

In August 2010, the Contra Costa County Children & Family Services Bureau (Bureau) filed a dependency petition alleging that Mother had neglected A.M.'s medical needs and failed to provide for A.M.'s support (Welf. & Inst. Code, § 300, subds. (b) & (g)),[2] and that A.M. had been sexually molested by James (§ 300, subd. (d)). A dependency petition was also filed alleging that James and Mother neglected A.R.'s medical needs and that A.R. was at risk of sexual abuse by James. (§ 300, subds. (b) & (d).)

The Bureau's August 9, 2010 detention/jurisdictional report regarding A.M. stated that Mother had not provided proper treatment for A.M.'s life-threatening Crohn's disease. The report also stated that A.M. told Melissa C., A.M.'s foster mother, that James had continuously sexually abused her from age 11 to age 14. According to A.M., "[James] did everything to me." The molestation stopped when A.M. began menstruating. After interviewing A.M. twice, the police said her statements were consistent and detailed and she appeared to be truthful about the molestation. James was arrested on July 21 for molesting A.M. The August 11 detention/jurisdictional report regarding A.R. stated that in September 2006, at 20 months of age, he was diagnosed as overweight and Parents failed to follow through with a diet plan or additional medical visits until June 2010, when he was described as extremely obese and had high blood pressure. A.R. also had documented speech problems for which Mother failed to begin treatment.

A.R. was ordered detained solely from James. A.M. was ordered detained from Mother and ordered to have no contact with James. Parents elected to be represented by the same attorney.

An August 25, 2010 memo from a Bureau social worker noted A.M. reported that A.R. frequently masturbated to the point of causing rawness and abrasions. A.R. told the social worker that he missed A.M.

In September 2010, Parents moved for an order prohibiting visitation between the Minors. The Bureau filed a response thereto.

In October 2010, the Bureau filed an amended section 300 petition regarding A.M. alleging that Mother failed to provide medical care resulting in A.M.'s hospitalizations and a life-threatening emergency and failed to protect A.M. from James's molestation.[3] The Bureau also filed a second amended section 300 petition regarding A.R. alleging that Parents neglected

---

[2] All undesignated section references are to the Welfare and Institutions Code.

[3] At the conclusion of testimony at the jurisdictional hearing, the court amended A.M.'s petition to conform to proof that the alleged sexual abuse occurred between 2004 and 2008.

his medical needs, and he was at risk of sexual abuse by James as a result of James's sexual abuse of A.M. It also noted Parents failed to acknowledge and seek treatment for A.R.'s behavior of masturbating to the point of hurting his penis.

On December 10, 2010, the court ordered supervised monthly visitation between the Minors.

### December 2010 Jurisdictional Report

The Bureau's December 2010 jurisdictional report regarding the Minors included various proposed witness statements.[4] A.M. would testify she obtained permission to live with a family friend whose home environment was less stressful than living with Mother and A.R. A.M. would also testify that during the relevant period James committed vaginal and anal penetration and oral copulation, and asked her to orally copulate him. A.M.'s friend since third grade, Teresa B.,[5] would testify that during an eighth grade art class, A.M. was upset and crying. When asked by Teresa whether James had "done anything to" or had raped A.M., A.M. nodded affirmatively. Teresa would also testify that she wrote in her journal about A.M.'s being raped and abused by James and that the journal was with the Martinez Police Department. Mother would testify that A.M. never disclosed to her that she was being molested by James. As to the allegations regarding A.R., A.M. would testify that A.R. masturbated until his penis was raw and bruised and he had complained to her that his penis hurt. A.R. would testify that he told his attorney that he touched his penis sometimes and it hurt.

### Police Reports[6]

An August 4, 2010 police report stated that A.M. reported that, shortly after the abuse stopped, she told Teresa she had been raped by James; A.M. had not told anyone else. An August 17 supplemental report stated that A.M. again said she told only Teresa about the incidents with James. An August 19 supplemental report stated that Martinez Police Investigator Fred Ferrera attempted to contact Teresa, but she did not return his calls. Melissa told Ferrera she had been in contact with Teresa, who said she would call Ferrera, but Teresa did not do so.

---

[4] The December 2010 jurisdictional report was admitted into evidence as county counsel's exhibit B.

[5] In the record, Teresa B. is occasionally referred to as Theresa B.

[6] Police reports from the Martinez Police Department were admitted into evidence at the jurisdictional hearing.

*Jurisdictional Hearing*[7]

Melissa

At the jurisdictional hearing, Melissa testified that she and Mother had been friends since elementary school. A.M. had been living with Melissa since May 2010. According to Melissa, the Minors are "very close." A.M. was A.R.'s primary caretaker on a daily basis for the first three years of his life and he preferred A.M. over Mother when he got hurt. A.M. complained to Melissa about missing out on time with friends because she had to take care of A.R. A.M. told Melissa she had stopped taking the medicine prescribed for her Crohn's disease because she hated her life and wanted to die. A.M. also told Melissa she and Mother fought a lot and she was afraid of Mother. A.M. first lived with Melissa for a few months after a month long hospitalization. In May 2010, after living with Mother for five or six months, A.M. got sick again and resumed living with Melissa. When A.M. turned 17 years old, she and Melissa had a conversation about lying and telling the truth. Thereafter, A.M. told Melissa that James had raped her between the ages of 11 and 14. Melissa said that, the year before, A.M. had told this to Melissa's daughter, who was 13 years old at the time of the jurisdictional hearing. After A.M. told Melissa, Melissa told her boyfriend to call the police. A.M. then described the details of James's molestation to Melissa. A.M. told Melissa she had told Teresa about the molestation during junior high school, while the molestation was occurring. Melissa said she called Teresa's mother that night.

A.M.

A.M. testified she began taking primary care of A.R. when he was three months old and Mother went back to work. She described her relationship with him as "very strong" and said she was "practically his mom." After A.M. got sick and was hospitalized, "CPS" (child protective services) told Mother A.M. had to go to school and could not stay home to watch A.R.

A.M. described in detail James's molestation of her beginning at age 10 or 11. She said that at a certain point Mother told her Mother and James were fighting and were no longer having sexual relations. A.M. said she eventually told her best friend, Teresa, that James had raped her. She said she may have told Teresa that it only occurred one time, but she could not remember. She also admitted that she falsely told Teresa that during the rape she was screaming "no." She testified she knew it was wrong, but allowed it, and

---

[7] The contested jurisdictional hearing took place over a one-month period, between January and February 2011.

initiated sex with James 30 to 40 percent of the time. A.M. said Teresa complied with her request not to tell anyone. A.M. said when she was about 13 years old she started telling James she wanted the sex with him to stop and she stopped initiating it. When she began menstruating at age 14, James stopped having sex with her. A.M. said that, when she was 15 or 16 years old, she told her friend "Maurice" about the sex with James. Thereafter, Melissa read about it in one of A.M.'s diaries. When Melissa asked if A.M. had been molested by James, A.M. answered affirmatively.

On cross-examination by the Minors' counsel as to whether she ever observed A.R. masturbating, A.M. said she saw him touching his penis, but was not sure whether he was masturbating. She had seen A.R.'s penis when it was "red" but not "where it got bad, because [she] heard [Mother] and [James] talking about how it got really bad and it was bleeding and how they had to put Vaseline on it, and they had to be careful when they washed him."

On cross-examination by Parents' counsel, A.M. said she was a virgin when James first molested her. She said that, in April 2007, when she talked to her high school counselor about being physically abused by Mother, she did not tell the counselor about the molestation because James would go to jail and Mother would be angry at her. A.M. said she falsely told the Bureau social worker she had had sex in the sixth or seventh grade with someone a year or two older than she. In fact, she was having sex with James at that time. A.M. said that, because she did not want to think about the past, she falsely told her pediatrician in January 2010 that she had not yet been sexually active, but had a boyfriend and wanted to "prepare." She also said that while hospitalized in June 2009, she requested to talk with a hospital social worker about the child protective services process because she did not want to live with Mother and wanted to get "away from her." During the meeting, A.M. did not tell the social worker she had been molested by James because she did not want to have to go to court, did not want James to "get in trouble," and did not want Mother to "hate [her] forever." A.M. also testified that, when she was admitted to the hospital in March 2010, she answered "no" to the question whether she had ever felt afraid of a family member or had been physically hurt or felt threatened in a relationship. The parties stipulated that when A.M.'s doctors inquired whether she had suffered sexual abuse, she did not report being molested by James.

### Gentry

Bureau social worker Roslyn Gentry testified she had been involved with this case since October 2010. She said that sibling visitation between the Minors had not occurred because Mother had not responded to her calls to set up the visits.

## Mother

Mother testified that, when she worked nights, A.M. cared for A.R. after school for about three hours until James came home. After being hospitalized in 2009 and telling the social worker that caring for A.R. was stressful, A.M. never again took care of A.R. Mother said that after James was arrested, social workers informed Mother that A.M. wanted to visit A.R. Mother did not think visitation was a good idea because she was concerned about what A.M. would say about James and who would supervise the visits.

Mother said she was unaware of anything inappropriate regarding the relationship between A.M. and James and had no indication from either of them that James was molesting A.M. A.M. never indicated to Mother she was uncomfortable with James and told Mother she was a virgin. Mother said she never saw A.R.'s penis red and raw from masturbation and never saw any injury to his penis.

On cross-examination, Mother testified that the Minors had a strong relationship during the first few years of A.R.'s life. She denied refusing visits between the Minors and said A.M. had two visits with A.R.

## James

James testified he lived with Mother from early 2003 until his 2010 arrest. He denied all of A.M.'s allegations of sexual abuse. He said A.M.'s testimony that she started taking care of A.R. when he was three months old was not true. He said A.M. babysat A.R. four to six hours a week for about a year.

## Closing Arguments

During closing arguments, the Bureau's counsel, Marke Estis, argued that A.M.'s testimony regarding the sexual abuse was "very believable" and she had no motivation to lie. In particular, Estis noted that the Bureau's December 2010 jurisdictional report stated that, in the eighth grade, A.M. had told her schoolmate, Teresa, about James's molestation. Estis argued that Teresa's statement was not objected to and, therefore, the court should accept it as though Teresa had testified at the hearing. Estis argued that Teresa's statement corroborated Melissa's testimony that A.M. told Melissa she had told Teresa about the molestation while it was occurring. The Minors' counsel also argued that A.M.'s allegations were credible and the amended petitions should be sustained.

In arguing that the petitions should be dismissed, Parents' counsel asserted that A.M. was manipulative, and her testimony was inconsistent and not credible.

## Jurisdictional Rulings

At the commencement of its oral statements following the jurisdictional hearing, the court stated that it had read "literally every single page of every single exhibit." It found that A.M. lies and manipulates people to get her way, and there were numerous lies and inconsistencies in her testimony. It noted that Teresa, Maurice, and Melissa's daughter were not called to testify at the hearing, and A.M.'s diary, allegedly containing information about the molestation, was not produced. The court found that A.M. was not credible, trustworthy, or reliable, and it did not sustain the sexual abuse (§ 300, subd. (d)) or failure to support (§ 300, subd. (g)) allegations in A.M.'s petition. The court sustained only the allegation in A.M.'s petition, under section 300, subdivision (b), that Mother failed to provide and ensure medical care resulting in A.M.'s hospitalizations and a life-threatening medical emergency. It found not true all of the allegations in A.R.'s petition and ordered it dismissed.

### February 2011 Dispositional Report

The Bureau's February 2011 dispositional report recommended that A.M. be adjudged a ward of the juvenile court and reunification services be offered to Mother. The report stated that A.M. was still residing with a nonrelated extended family member and A.R. was residing with Mother and James. It also stated that A.M. had had very little contact with A.R. In February 2011, A.M. had three social worker supervised visits with A.R., which went well. A.M. did not speak negatively about Mother during the visits. However, thereafter, Parents decided they did not want to continue the visits; calls to Mother and her attorney were not returned and visits did not resume. The social worker concluded that it would be in the Minors' interests to maintain their relationship, which the social worker described as "significant." The report requested that Parents make A.R. available for visitation with A.M. and commit to a consistent visitation schedule. However, the Bureau's recommended order did not include visitation between the Minors.[8]

---

[8] The report did recommend that A.M. have supervised twice monthly visitation with Mother and monthly supervised visitation with her alleged natural father, Robert M., for whom it was recommended that reunification services be denied. It also provided that the Bureau should consider A.M.'s wishes and input from her counsel and treating therapist in establishing the frequency, time, place, and length of visits with Mother and Robert M.

*March 2011 Dispositional Hearing*

At the March 21, 2011 dispositional hearing, Mother's counsel argued that Parents requested there should be no visitation between the Minors until A.M. had undergone a certain number of therapeutic appointments. The court refused the request. Mother's counsel informed the court that Parents had "split up" and James and A.R. had relocated to Texas. Mother said she agreed to A.R.'s relocation. A.M.'s counsel stated that A.M.'s primary concern was that she be able to see A.R. The court ordered A.M. to have twice monthly supervised visitation with A.R., to be paid for by Parents, but acknowledged such visits are unlikely unless James and A.R. return from Texas. The court ordered Mother to advise the Bureau if A.R. is in town. The court's written dispositional order specified that A.M. is to have supervised visitation with Mother, A.R., and Robert M. As to A.R., it specified twice monthly one-hour visits. Responsibility for payment of supervision during visits is not mentioned in the written dispositional order.

## I. The Minors' Appeal*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II. James's Appeal

James contends the court lacked authority to order visitation between the Minors and, therefore, the visitation order is voidable. He argues that since A.R.'s dependency petition was dismissed without a finding of jurisdiction, the court had no authority over A.R. James also argues that since he is not the father of A.M., he was not subject to the court's jurisdiction.

### A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. Merits

James contends the court acted in excess of its jurisdiction in ordering supervised visitation between the Minors and in ordering James to facilitate and pay for those supervised visits.[12] James argues that because he is not A.M.'s parent and because the court dismissed A.R.'s dependency petition

---

*See footnote, *ante*, page 1160.

[12] Since Mother has not appealed the court's order, we disregard James's assertion that the court lacked authority to order Mother to facilitate and pay for the supervised visitation.

without adjudging A.R. a dependent child of the court, it lacked subject matter jurisdiction and in personam jurisdiction over James and A.R.

■ " 'A judgment is void if the court rendering it lacked subject matter jurisdiction or jurisdiction over the parties. Subject matter jurisdiction "relates to the inherent authority of the court involved to deal with the case or matter before it." [Citation.] Lack of jurisdiction in this "fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." [Citation.] [¶] In a broader sense, lack of jurisdiction also exists when a court grants "relief which [it] has no power to grant." [Citations.] Where, for instance, the court has no power to act "except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites," the court acts without jurisdiction in this broader sense. [Citation.]' [Citation.] [¶] 'The consequences of an act beyond the court's jurisdiction in the fundamental sense differ from the consequences of an act in excess of jurisdiction. An act beyond a court's jurisdiction in the fundamental sense is void; it may be set aside at any time and no valid rights can accrue thereunder. In contrast, an act in excess of jurisdiction is valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time. [Citations.]' [Citation.]" (*In re Andres G.* (1998) 64 Cal.App.4th 476, 482 [75 Cal.Rptr.2d 285] (*Andres G.*).)

■ "In dependency proceedings, ' "[a] superior court convened as and exercising the special powers of a juvenile court is vested with jurisdiction to make only those limited determinations authorized by the legislative grant of those special powers." [Citations.] In the absence of such specific statutory authorization, a juvenile court is vested with authority to make only those determinations which are "incidentally necessary to the performance of those functions demanded of it by the Legislature pursuant to the Juvenile Court Law." [Citation.]' [Citation.]" (*In re Silvia R.* (2008) 159 Cal.App.4th 337, 345–346 [71 Cal.Rptr.3d 496].)

The filing of A.R.'s dependency petition vested the juvenile court with subject matter jurisdiction, i.e., the inherent authority to deal with the case or the matter before it. (*Andres G., supra*, 64 Cal.App.4th at p. 482.) When the court dismissed A.R.'s petition following the jurisdictional hearing, A.R. was no longer in need of the juvenile court's protection and its jurisdiction over him terminated. (See *In re Robert L.* (1998) 68 Cal.App.4th 789, 794 [80 Cal.Rptr.2d 578] [exercise of juvenile court jurisdiction must be based on existing and reasonably foreseeable future harm to minor's welfare].)

Thereafter, the subject visitation order was made by the court following the dispositional hearing in A.M.'s case. At that hearing, the court had jurisdiction over A.M., not A.R. And, since James is not A.M.'s father, the court had no jurisdiction over him at that hearing.

Moreover, there is no statutory provision requiring sibling visitation in these circumstances. Section 361.2, subdivision (i) provides: "Where the court has ordered removal of the child from the physical custody of his or her parents pursuant to Section 361, the court shall consider whether there are any *siblings under the court's jurisdiction*, the nature of the relationship between the child and his or her siblings, the appropriateness of developing or maintaining the sibling relationships pursuant to Section 16002, and the impact of the sibling relationships on the child's placement and planning for legal permanence." (Italics added.) Because A.R. was not under the court's jurisdiction at the time of A.M.'s dispositional hearing, this section is inapplicable.

■ In support of the court's visitation order, the Bureau relies on section 388, subdivision (b),[13] which permits a person who desires a sibling relationship with a child, who is either a dependent of the juvenile court or the subject of a dependency petition, to petition the court to assert that relationship and seek, inter alia, visitation with the dependent child.

■ Although no such section 388 petition by or on behalf of A.R. was filed in this case, the Bureau asserts, with no citation to the record, "[t]his is in effect what happened at [A.M.'s dispositional] hearing." At A.M.'s dispositional hearing, her counsel stated that being able to visit A.R. was of "primary concern" to A.M. However, nothing in the record reflects any request, formal or informal, from A.R. Further, section 388, subdivision (b) expressly requires the filing of a verified petition on behalf of a person seeking sibling visitation with a dependent of the juvenile court. Since no such petition was filed here, that section is inapplicable.

---

[13] Section 388, subdivision (b) provides in part: "Any person, including a child who is a dependent of the juvenile court, may petition the court to assert a relationship as a sibling related by blood, adoption, or affinity through a common legal or biological parent to a child who is, or is the subject of a petition for adjudication as, a dependent of the juvenile court, and may request visitation with the dependent child, placement with or near the dependent child, or consideration when determining or implementing a case plan or permanent plan for the dependent child or make any other request for an order which may be shown to be in the best interest of the dependent child. . . . The petition shall be verified and shall set forth the following: [¶] (1) Through which parent he or she is related to the dependent child. [¶] (2) Whether he or she is related to the dependent child by blood, adoption, or affinity. [¶] (3) The request or order that the petitioner is seeking. [¶] (4) Why that request or order is in the best interest of the dependent child."

██ Since there is no statutory authority providing for A.M.'s visitation with A.R., the court acted in excess of its dependency jurisdiction in ordering such visitation.

## DISPOSITION

The jurisdictional orders as to A.M. and A.R. are affirmed. The dispositional order as to A.M. is reversed to the extent it ordered sibling visitation between her and A.R. In all other respects it is affirmed.

Jones, P. J., and Bruiniers, J., concurred.

On March 7, 2012, the opinion was modified to read as printed above.