Filed 3/29/21  In re S.M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re S.M., a Person Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.M. et al., <br><br> Defendants and Appellants. | F081680 <br><br> (Super. Ct. No. JV8028) <br><br><br> **OPINION** |

**THE COURT**[*]

APPEAL from orders of the Superior Court of Tuolumne County.  Donald I. Segerstrom, Jr., Judge.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant D.M.

Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant James M.

Sarah Carrillo, County Counsel, and Maria Sullivan, Deputy County Counsel, for Plaintiff and Respondent.

---

[*]    Before Poochigian, Acting P.J., Franson, J. and Peña, J.

D.M. (mother) appeals from orders after a Welfare and Institutions Code section 366.26[1] hearing, at which the juvenile court terminated her parental rights to daughter S.M., now age three. Mother contends the juvenile court erred by failing to apply the sibling relationship exception to adoption. She also contends, for the first time on appeal, that although S.M.'s sisters were not dependents of the juvenile court, section 16002 regarding sibling placement was applicable to this matter, requiring reversal of all post-dispositional orders, including the order terminating her parental rights. James M. (father) does not raise any issues but joins in mother's argument. We affirm.

## SUMMARY OF FACTS AND PROCEDURE

Mother has three children: S.M., now age three, and at issue here, as well as two older children, D.H., now age 12, and T.M., now age seven. Father is the presumed father of both S.M. and T.M.

In April of 2019, sheriff's deputies were investigating an elder abuse referral and found S.M., then 17 months old, in the care of two individuals, both known to the deputies due to prior arrests for possession and use of illicit substances. One of the individuals reported that mother dropped S.M. off with them and left. The home where S.M. was found included methamphetamine pipes and razor blades within the child's reach, as well as unidentified pills, hypodermic needles, a piece of tin foil with brown residue, and a marijuana pipe and leaf clippings. Both individuals were arrested.

Mother was contacted by Tuolumne County Department of Social Services (department) and asked to return to the residence. Mother admitted dropping S.M. off at the home, stating she left the child there while she gave a friend a ride. She admitted knowing that both the individuals were drug users and one of the two had been arrested a

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

week prior. She denied seeing any evidence of drug paraphernalia or use in the home, although much of it was found in plain sight. Mother smelled "strongly" of alcohol and she tested presumptively positive for methamphetamine, amphetamine, MDMA and opiates. She was arrested for child endangerment and S.M. placed into protective custody. It was later learned that mother started drinking alcohol at 10:00 a.m. that morning.

Mother met with a social worker at the department the following day. Mother informed the social worker that her two older children were staying with mother's sister, Heather G., who was going to file for guardianship. Mother had signed a safety plan for the two older girls agreeing that she would not have any unsupervised contact with them. Mother explained that father was in prison, and she admitted to prior child welfare history with her oldest child, D.H.

*Petition*

The department filed a section 300 petition on April 15, 2019, alleging risk of harm to S.M. due to mother's substance abuse and leaving the child with an inappropriate caregiver. The petition further alleged that father was incarcerated and unable to arrange for the minor's care. The petition also alleged that S.M.'s older sister D.H., had previously been declared a dependent based on mother's chronic substance abuse. While she had successfully reunified with D.H., mother had recently tested positive again for illicit substances.

*Detention Hearing*

Mother was present at the detention hearing on April 16, 2019. S.M. was ordered detained pending a jurisdictional hearing. The department informed the juvenile court that it was assessing potential placement with S.M.'s maternal aunt, Heather G., where the two older siblings were living. Temporary care and custody of S.M. was vested with the department. Heather G. applied for emergency placement of S.M. with her, which

was granted on April 16, 2019. A family finding referral was made on May 6, 2019, in order to identify other relatives for possible placement.

A jurisdiction hearing was set for May 7, 2019 but continued to perfect ICWA notice until May 28, 2019.

*Jurisdiction Hearing*

The report prepared for jurisdiction indicated S.M. had been placed with Heather G., where her siblings resided, pursuant to section 361.3.[2]

The report requested that the juvenile court take judicial notice of the petitions and orders in mother's previous 2012 and 2013 dependency cases regarding D.H. and T.M. It was during D.H.'s dependency that mother gave birth to T.M. in 2013. A dependency proceeding was initiated as to her, but she was left in mother's home. Dependency proceedings were terminated in June of 2014. The documents requested to be noticed were attached to the report.

Father's criminal history included a 2017 conviction for multiple felonies, including battery with serious bodily injury. He was incarcerated and eligible for parole in November 2019. Mother had multiple arrests and several convictions for various

---

[2]     Section 361.3 provides, in relevant part, that "[i]n any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative …." Section 361.3 further provides that, in determining whether placement with a relative is appropriate, the court social worker and the court shall consider, inter alia, the best interest of the child (*id.* at subd. (a)(1)); the wishes of the parent, the relative, and child, if appropriate (*id.* at subd. (a)(2)); placement of the siblings and half siblings in the same home as provided in Section 16002 (§ 361.3, subd. (a)(4)); the good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect (*id.* at subd. (a)(5)); and the nature and duration of the relationship between the child and the relative (*id.* at subd. (a)(6)).

substance abuse related offenses between 2008 and 2017. She had an April 2019 arrest for willful cruelty to a child stemming from the facts underlying this action.

At the jurisdiction hearing, mother submitted on the petition. The juvenile court found the petition true and set disposition for June 11, 2019. The juvenile court took judicial notice of the requested prior dependency case documents.

*Disposition*

Following mother and father's request, a contested disposition hearing was set for July 19, 2019.

The report prepared for the disposition hearing indicated that mother failed to attend a June 28, 2019, child family team meeting to discuss S.M.'s placement. Heather G.'s home had to be re-evaluated regarding appropriateness of emergency placement of S.M. as Heather had recently separated from her boyfriend, a co-applicant for placement, and she no longer had stable housing. She did not have her own transportation or income, aside from the caregiver stipend she received for S.M.

Heather G. and maternal grandmother were both present at the team meeting, and it was decided that mother would move out of maternal grandmother's home and Heather G. and the two older children would move in with maternal grandmother. Maternal grandmother would have to apply for placement and be approved before S.M. could be placed back in Heather G.'s care.

On July 2, 2019, S.M. was placed in temporary placement and efforts continued to locate other potential relative placements.

Mother had been in and out of drug treatment and it was recommended that mother be denied services, but that father be offered services.

At the July 19, 2019, disposition hearing, the juvenile court declared S.M. a dependent, removed her from mother's custody, and denied custody to father. It found the temporary placement appropriate but added that the department was to make diligent efforts to locate and contact relatives, and if they can be approved for placement, then the

5.

relative placement preference should be observed. Care, custody and control of S.M. remained under the supervision of the department. It further denied services to mother pursuant to section 361.5, subdivision (b)(13), due to previous drug abuse and treatment within a certain time period. Services were ordered for father. A six-month review was set for January 7, 2020.

*Six-Month Review*

The December 27, 2019, report prepared for the six-month review requested a three-week continuance to gather information regarding father's parole date. The prison indicated father's parole eligibility was October 2024, father claimed it was November 21, 2019. The department reasoned that, if father was released in early 2020, continued services would be beneficial; if it was not until 2024, continued services would not be in S.M.'s best interest.

While mother had not been offered services, she had entered a residential treatment center but was discharged on October 14, 2019, after relapsing.

The report stated that S.M. had been moved from Heather G.'s home to her current placement on July 2, 2019. The placement was not concurrent[3] but another family that often provided respite care for S.M. was interested in being a concurrent placement. Heather G. was going through the resource family approval (RFA) process again but had not yet been approved.

Following several requests, the review was continued to February 28, 2020. An addendum report for the hearing recommended that services for father be terminated and a section 366.26 hearing set. The report also stated that S.M. was to be moved shortly to a concurrent home, with whom she had been staying periodically for respite care. Heather G. had still not been approved for RFA placement.

---

**3** A concurrent placement indicates a potential adoptive placement, while a nonconcurrent placement does not.

At the February 28, 2020, hearing, mother's counsel reported that she had spoken to a social worker and was told Heather G. and the parties were waiting for documentation from law enforcement in order to process an exemption necessary for RFA placement.

At the March 11, 2020, contested hearing, the juvenile court terminated father's services. At the time, the juvenile court specifically took judicial notice of father's prior child welfare case with T.M.

The juvenile court found that S.M. did not have any siblings under juvenile court jurisdiction and that S.M.'s current out-of-home placement was appropriate. A section 366.26 hearing was set for June 30, 2020. Mother and father were both verbally noticed of their writ review rights, but neither filed a Notice of Intent to File Writ Petition.

*Section 366.26 Hearing*

The section 366.26 report recommended that mother and father's parental rights be terminated, and adoption selected as S.M.'s permanent plan. S.M. was said to be physically healthy, on-target developmentally, and advanced in language development. She was happy and did not appear to have any mental or emotional issues.

S.M. had been moved from her non-concurrent foster placement to the home of the respite foster home in January of 2020, as a concurrent home. She had to be moved to another prospective adoptive placement in May of 2020, after the mother in the previous home changed occupations which required lengthy travel out of the area. However, this placement gave notice in June 2020 due to concerns over S.M.'s eating habits and arguing with another two-year-old in the home. The former caregiver, with whom S.M. had been placed from January through May, indicated they would like placement again and were committed to providing permanency. S.M. had not yet been moved at the time of the writing of the report.

Mother consistently visited S.M. In April and May, the visits had been via video conferencing due to Covid-19 restrictions. Father had not participated in visitation and

7.

had only visited S.M. a few times through her life. S.M. participated in monthly visits with her siblings, Heather G. and maternal grandmother.

Heather G. continued to pursue RFA, but the report indicated it was unlikely that she would be approved due to an inability to get a criminal background and substance abuse history clearance. The report concluded it was not in the best interest for S.M. to be placed with her siblings because of Heather G.'s inability to be approved though RFA.[4]

An adoption assessment specialist found S.M. to be an adoptable child. While she was not placed in an adoptive home at that time, the assessment was based on her youth, good health, and happy demeanor. The adoption assessment noted that S.M. had two older siblings who were placed with Heather G. through legal guardianship. The caretakers at the time of the assessment were open to arranging contact between S.M. and her siblings. The adoption specialist opined that it was not in S.M.'s best interests to be placed with her sisters due to Heather G.'s inability to obtain RFA.

An adoption assessment addendum indicated that the adoption specialist had received a call on June 12, 2020, from S.M.'s former placement indicating that they would like to provide permanency for S.M. The caregiver explained that her new employment position would no longer require extensive travel. The caregivers expressed their love for S.M. and that they were capable of dealing with her eating issues and did not have young children in the home that S.M. felt compelled to compete with. After thorough discussion, the adoption specialist determined that placing S.M. back into this

---

[4] It was later clarified that the criminal and substance abuse history problem was not with Heather G., but with maternal grandmother, with whom Heather G. resided and who was the owner or legal occupant of the home. Heather G. did not have the resources to care for D.H., T.M. and S.M. on her own, and for that reason she moved in with her mother, the maternal grandmother. But maternal grandmother had licensing/RFA issues that were never resolved, thereby precluding S.M. from residing with Heather G. and her siblings.

home was appropriate. The caregivers, however, were not interested in entering into a written postadoption agreement for contact with S.M.'s birth family, including mother or father.

After several continuances, the contested section 366.26 hearing was held August 21, 2020. Mother appeared in person, father by telephone. The juvenile court stated that it had read and considered the section 366.26 report, the original adoption assessment, and the addendum adoption assessment. At the department's request, the juvenile court admitted a toxicology report for mother and a letter from the RFA regarding maternal grandmother's application for approval. The department submitted on the evidence.

Mother called Heather G., who testified that S.M. had lived with her and her two siblings for "four or five months" the previous year when she was in her own apartment. S.M. was then removed when Heather G. broke up with her boyfriend and she was "kicked out" of her apartment. Heather G. testified that she was going to move to maternal grandmother's but could not take S.M. there with her "because of the history of the house," which she described as "[a]ll the raids" conducted by probation. Heather G. testified that she had been living at maternal grandmother's for about a year with D.H. and T.M.

According to Heather G., T.M. asked about S.M., but they had only visited her once or twice when she was first removed, and the last visit was in April of 2020. Heather G. testified that she did not request visits after April of 2020 because she was "overwhelmed with those kids" and did not want to see S.M. when "all of this is going around," alluding to Covid-19.

Heather G. testified that she did want S.M. placed with her, but she had not talked to the department about making this happen. Heather G. still lived with maternal grandmother. Heather G. stated that she did not follow through on the RFA process for permanent placement of S.M. after they originally placed S.M. with her on an emergency

basis, as she did not think she had to. Maternal grandmother was applying with her, but she stopped after they removed S.M.

When asked by the juvenile court to clarify her status with T.M. and D.H., Heather G. replied that she had guardianship of them.

Maternal grandmother testified that S.M. lived with her from birth to age two, until she was placed with Heather G. When asked if mother and S.M. still had a "mother-daughter bond," maternal grandmother replied, "[p]ossibly" "[j]ust because she hasn't been around her for a long time."

According to maternal grandmother, the siblings were together when mother was in the process of getting D.H. and T.M. back during the previous dependencies, and the siblings had lived together most of S.M.'s life. Maternal grandmother testified that T.M. loved S.M. and D.H., who has autism, is a bit more distant. The three had a video chat about two weeks prior and had two such chats in the previous three months. When asked if she thought there would be a problem if S.M. no longer had a relationship with her sisters, maternal grandmother stated that S.M. might be "confused," but "she's a happy girl; so I'm sure she's going to be happy wherever she's at."

Mother called the social worker, who testified that S.M. was placed with Heather G. shortly after she was removed from mother in April of 2019 and stayed with her until late June 2019. A recent check of the application status of Heather's RFA showed it was not approved, so "they," meaning Heather G. and maternal grandmother, could not be considered. Maternal grandmother and Heather G. lived together in maternal grandmother's home, and they applied together. The social worker explained that the RFA team is not a part of child welfare services. As such, it was not up to the social worker to determine who can be approved for placement.

The social worker had no concerns about S.M.'s current placement, and she was likely to be adopted by them. The social worker opined that terminating parental rights would not be detrimental to S.M.'s relationship with her siblings because the "caregiver

10.

is really open to keeping communication with her siblings after adoption." The social worker had had numerous conversations with the caregivers about the importance of maintaining birth family contact.

Mother testified that S.M. was currently two and a half years old, "brilliant, and "talkative." Mother testified regarding her own bond with S.M. and the nature of her visits with her. A week later, following an adjournment, mother resumed the witness stand and testified that she was currently clean and sober from drugs and alcohol, "[f]or about a week and a half now."

In closing, mother's counsel argued that the department should have provided Heather G. assistance in finding her own housing and having S.M. back in her care. Counsel argued further that adoption should not occur, as to allow Heather G. a chance to find alternative housing. When asked by the juvenile court how long this would take, counsel suggested that "one of the exceptions" to adoption should apply and S.M. be placed in guardianship.

The juvenile court found S.M. to be both generally and specifically adoptable by clear and convincing evidence. The juvenile court found that, while mother maintained visitation with S.M., it could not find that the benefit of maintaining visitation outweighed the benefits of permanency, and the parent-child relationship exception did not apply. It also found, after lengthy analysis, that mother had failed to show that the benefit of maintaining sibling contact outweighed the benefits of adoption for S.M. Parental rights were terminated.

## DISCUSSION

### I. THE SIBLING RELATIONSHIP EXCEPTION

Mother, joined by father, argues the juvenile court erred in not applying the sibling relationship exception to termination of parental rights. We find no merit in the parents' position.

11.

If a juvenile court finds that a child is likely to be adopted, adoption must be ordered unless there is a "compelling reason" to apply one of the statutorily enumerated exceptions.  (§ 366.26, subd. (c)(1)(B).)  One of the specified exceptions is the sibling relationship exception, which applies where "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)[5]

Employing a two-step process, the juvenile court first determines whether terminating parental rights would substantially interfere with the sibling relationship.  (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952 (*L. Y. L.*).)  If this first requirement is met, "the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*Ibid.*; § 366.26, subd. (c)(1)(B)(v).)  "[E]ven if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 61 (*Celine R.*).)

The parent opposing adoption has the burden of proving the statutory exception for sibling relationships applies.  (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.)  This is considered "a heavy burden."  (*Ibid.*)  The authors of the legislation adding the sibling relationship exception envisioned that its applicability would "'likely be rare,'" meaning

_____

[5]     If the juvenile court finds the sibling relationship exception applies, it must select legal guardianship or long-term foster care rather than adoption.  (§ 366.26, subd. (c)(4)(A).)

12.

"that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." (*L. Y. L., supra,* 101 Cal.App.4th at p. 950; see *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014 ["application of this exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount"].)

The sibling relationship exception is "evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings." (*In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)

We review the court's factual findings underlying the sibling relationship exception for substantial evidence and the court's weighing of competing interests for an abuse of discretion. (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437–438; *D.O., supra,* 247 Cal.App.4th at p. 174.)[6]

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*L. Y. L., supra,* 101 Cal.App.4th at p. 952, fn. omitted.)

In this case, substantial evidence supports the trial court's conclusion that the sibling relationship exception does not apply. The record supports both (1) a finding that there would be no interference with the siblings' relationship, and (2) a finding that S.M. would not suffer detriment if her relationship with the siblings ended.

---

**6** The question of what standard of appellate review applies to another statutory exception to adoption (the beneficial parental relationship exception) is currently pending before our Supreme Court. (*In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.)

Here, there is substantial evidence in the record to support a finding that terminating the parents' rights and ordering adoption would not substantially interfere with S.M.'s sibling relationships. Mother provided no evidence to the contrary. The juvenile court found the social worker's testimony credible and, while not dispositive, that S.M.'s caregivers intended to facilitate her existing relationship with her siblings, despite not wishing to enter into a written postadoption agreement. This is an appropriate factor for the juvenile court to consider in analyzing the sibling relationship exception, because freeing the child for adoption terminates parental rights but not sibling relationships. (See, e.g., *D.O., supra,* 247 Cal.App.4th at p. 175 [juvenile court may consider assurances of continued sibling visits in determining whether there will be substantial interference with a sibling relationship]; *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019 [there was "no evidence that the relationships between any of the siblings will necessarily cease upon termination of parental rights," where prospective adoptive parents were willing to allow siblings to continue their relationship], disapproved on other grounds in *In re S.B.* (2009) 46 Cal.4th 529, 537, fn. 5.) There was evidence from the social worker, from the adoption assessment specialist, and from the caregivers that S.M. and the siblings would be able to stay in touch. The juvenile court could properly credit this evidence.

There was also no substantial evidence of a bond between the children or that S.M. would suffer detriment on terminating her sibling relationships. (See *L. Y. L., supra,* 101 Cal.App.4th at p. 952.) S.M. was about two and a half years old at the time of the hearing. She had lived with her sisters from birth until taken into protective custody at 17 months. She was too young to have meaningful interactions with them, share common interests or have an emotional connection with them. Since being removed, she had had a few visits, but nothing since April 2020, four months previous. S.M. was doing well and was a happy child in the home of her caregivers, apart from her siblings. The

evidence amply supports a finding that S.M. would not suffer detriment from severing her sibling relationships. (*Ibid.*)

The only contrary evidence provided by mother was her testimony, and the testimony of maternal grandmother and Heather G., who mostly focused on the siblings' relationship with S.M. rather than vice versa. Heather G. testified that T.M. is "always" asking about S.M. Maternal grandmother, when asked about how the siblings are together, replied that "T.M. loves her little sister" but that "D.H. is a little distant" due to her autism.

On appeal, however, we review the record to determine whether substantial evidence supports the juvenile court's ruling, not mother's position. In any event, the evidence mother references show the *siblings'* perspective, that is, the siblings may have had a greater awareness and fondness for their baby sister. However, in analyzing the sibling relationship exception, our focus is on the benefits and burdens to the adoptive child, not the siblings. (*Celine R., supra,* 31 Cal.4th at p. 54.) We reject mother's arguments based on this record.

We further conclude the court did not abuse its discretion in finding that the benefits of adoption outweighed the benefits of S.M.'s sibling relationships. The purpose of the sibling relationship exception is to "preserv[e] long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404 [sibling relationship exception did not apply for child removed as a newborn].) Here, the siblings never served as "anchors" for S.M. Due mostly to her age and circumstances of removal, S.M. relied almost entirely on her caregivers to meet her emotional and physical needs.

The juvenile court considered S.M.'s need for stability and permanence. While mother argues that the three children had positive, healthy interactions, this is relevant but fails to establish that the court abused its discretion when it weighed this factor against the benefits of adoption. (See *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293

15.

["[A]lthough the minor clearly enjoyed the time she spent with her half siblings, there was no evidence that the detriment she might suffer if visits ceased presented a sufficiently compelling reason to forgo the stability and permanence of adoption by caretakers to whom she was closely bonded."].)

To summarize, given the limited nature and strength of the sibling bond between S.M. and the siblings, the juvenile court had substantial evidence to support its finding that their relationship was not so significant that its loss would be detrimental, and the court did not abuse its discretion in determining that the benefits to S.M. of adoption outweighed any bond she might have with the siblings. This was not an appropriate case for application of the statutory exception. (§ 366.26, subd. (c)(1)(B)(v).)

II.    THE APPLICABILITY OF SECTION 16002

Mother, joined by father, also contends that the juvenile court failed to apply section 16002 to this case. We find no error.

Section 16002 states the legislative intent to "ensure the preservation and strengthening of the child's family ties by ensuring that when siblings have been removed from their home, ... the siblings will be placed in foster care together, unless it has been determined that placement together is contrary to the safety or well-being of any sibling. The Legislature recognizes that in order to ensure the placement of a sibling group in the same foster care placement, placement resources need to be expanded." (§ 16002, subd. (a)(1).) The department is required to "make a diligent effort in all out-of-home placements of dependent children ... , to place siblings together in the same placement, and to develop and maintain sibling relationships. If siblings are not placed together in the same home, the social worker ... shall explain why the siblings are not placed together and what efforts he or she is making to place the siblings together ...." (§ 16002, subd. (b).)

Similarly, where "the court has ordered removal of the child from the physical custody of the child's parents pursuant to Section 361, the court shall consider whether

16.

there are any siblings under the court's jurisdiction, ... the nature of the relationship between the child and their siblings, the appropriateness of developing or maintaining the sibling relationships pursuant to Section 16002, and the impact of the sibling relationships on the child's placement and planning for legal permanence." (§ 361.2, subd. (j); see also § 366, subd. (a)(1)(D)(i) [directing juvenile court to consider the same matters at review hearings].)

Mother acknowledges that these principles apply to those instances where the juvenile court has removed all the children from the custody of their parents and the department has placed them in different settings. (*In re A.R.* (2012) 203 Cal.App.4th 1160, 1171.) As even understood by mother, all the children must be subject to the jurisdiction of the juvenile court for section 16002 to apply. Here, only S.M. was subject to the jurisdiction of the juvenile court.

Mother insists, however, that section 16002 applies here and that we must reverse the termination of parental rights to some unspecified point early in the proceedings and make efforts to "reunify" the siblings. As argued by mother, her case is "highly unusual" and D.H. and T.M. are not subject to the juvenile court "only because [the department] deliberately chose not to make them dependents and told Heather G. to pursue a guardianship in lieu of making them subject to the juvenile court." (Boldface omitted.) Mother argues that, while the department may have been concerned about D.H. and T.M., "it elected to compel/coerce Heather G. to seek a guardianship over them with the threat of making them dependents and with the possibility that parental rights over them might also be terminated and she and the other members of her family would be forever cut off from the three sisters." Mother alleges the department did this because S.M. was a toddler and could easily be placed for adoption, while her sisters were older and would not be.

17.

Mother's argument relies heavily on hearsay statements contained in the sister's guardianship files, which were not before the juvenile court.[7] We reject mother's argument on two grounds. First, section 16002 is not applicable in this case because S.M.'s siblings were not under the jurisdiction of the juvenile court. And second, mother cannot now raise a legal theory on appeal that was not raised below. (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 82.) The hearing from which this appeal was taken was a section 366.26 hearing, wherein placement was not an issue before the juvenile court. Mother was given numerous opportunities to challenge the earlier placement orders in the juvenile court but failed to do so.

Most importantly, however, mother ignores the department and trial court's focus throughout this case on Section 361.3, which mandates that for any case in which a child is removed from his or her parents pursuant to section 361, like the present case, *preferential consideration* shall be given to a request for placement by a relative of the child. Preferential consideration is defined as "the first placement to be considered and investigated." (§ 361.3, subd. (c)(1).) Factors to consider *shall* include the best interests of the child, the wishes of the parent, and placement of siblings and half siblings in the same home, unless that placement is found contrary to the safety and well-being of any of the siblings, as provided in Section 16002. (§ 361.3, subd. (a).)

As outlined above, S.M.'s maternal aunt Heather G. applied for and obtained emergency placement of S.M. in April 2019. For financial reasons, Heather G. could not continue to support S.M. and her two older siblings on her own, and they moved in with Heather G.'s mother, S.M.'s maternal grandmother. Mother supported this placement, as did the department, assuming that RFA approval was given. Because of concerns with grandmother's past criminal activity, the department had to seek other temporary

---

**7** Mother's request for judicial notice filed on December 16, 2020, is hereby denied. (Evid. Code, § 452.)

placement for S.M. pending RFA approval. RFA approval was never obtained because of some past criminal issues involving grandmother, so placement with Heather G. and her siblings proved impossible. The sibling preference was adequately and consistently addressed by the department and the trial court.

## DISPOSITION

The orders are affirmed.